IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FRANK BROWN,                          )
                                     )
                    Plaintiff,        )
                                     )
vs.                                  )  Case No. 10-CV-2296 JAR/JPO
                                     )
SCRIPTPRO, LLC,                       )
                                     )
                    Defendant.        )
_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Frank Brown, asserts four claims in this lawsuit against his former employer, ScriptPro, LLC (hereinafter "ScriptPro"):  (1) interference with his rights under the Family and Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"); (2) retaliation for exercising his rights under the FMLA; (3) disparate treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); and (4) overtime wages due pursuant to Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA").  ScriptPro has filed a motion for summary judgment as to all four of Mr. Brown's claims.  (Doc. #38)  As will be discussed in detail below, a reasonable jury could return a verdict in favor of Mr. Brown on each of his claims.  Consequently, ScriptPro's motion must be denied in its entirety.

## STATEMENT OF FACTS

Pursuant to D. Kan. Rule 56.1, Mr. Brown will first respond to the facts set forth in ScriptPro's memorandum in support of summary judgment.  (Doc. #39)  Mr. Brown will then set forth additional facts which, together with ScriptPro's facts, raise disputed issues which must be submitted to the jury.

## A. Facts Set Forth In ScriptPro's Memorandum

1.-5.    Uncontroverted.

6.       Controverted for purposes of summary judgment only.   Mark Eaker testified that he did not directly supervise Frank Brown and that Mr. Brown's direct supervisor was Tammy Becker.  Ex. C (Eaker Depo. 11:12-17; 33:7-10; 56:6-13.)

7.-11.  Uncontroverted.

12.      Controverted in part.    Brown's written performance review had a cumulative rating of 2.8 but the review does not indicate what cumulative rating constitutes a satisfactory or unsatisfactory review and does not indicate that a cumulative rating of 2.8 is below "meets job requirements."  See Defendants Ex. 7 (July 2008 Performance Review).

13.      Uncontroverted but must be supplemented.   One of the areas marked "MM" contains a comment that Mr. Brown was "[a]ble to complete varied projects in a timely manner."  See Defendants Ex. 7 (July 2008 Performance Review).

14.      Uncontroverted but must be supplemented.   In his response to the July 2008 evaluation, Mr. Brown denies that he has loud personal conversations at his desk and indicates that none of his co-workers or supervisors have ever raised this concern with him.   Ex. F (Frank Brown's Response to Performance Review).   Further, Eaker testified that he never found Mr. Brown to be argumentative or abrasive.  Ex. C (Eaker Depo. 38:2-5).

15.      Uncontroverted but must be supplemented.   The comment referenced reads, in full:

> *Able to complete varied projects in a timely manner.*  There is a
> concern regarding excessive internet use during working hours.  Will

continue to increase his work load over the next year to see how the additional workload is handled.

See Defendants Ex. 7 (July 2008 Performance Review) (emphasis added).  Mr. Brown, in his response to the review, indicated:

> Over a year ago, I was given an "informal review".  My supervisor mentioned a concern about how much time I was spending on the Internet.  She also commented that she understood and sympathized that I had only worked at ScriptPro for 3 months and that I had very little work to do.  I reduced my Internet time in response to her feedback and Internet use has not been mentioned to me again since then.

Ex. F (Frank Brown's Response to Performance Review).

16.     Uncontroverted but must be supplemented.   Mark Eaker was the supervisor who debriefed Mr. Brown on his evaluation and Mr. Brown informed Mr. Eaker at that meeting that he disagreed with information contained in the review.  Ex. C (Eaker Depo. 33:23 – 34:25).

17.     Controverted in part.   Mr. Brown testified that there were a "couple of times" when discussions with his wife may have gotten heated but he "never stepped outside the bounds of professionalism" and no one ever said anything to him regarding those conversations.  Ex. A (Brown Depo. 148:18-25).

18.     Uncontroverted but must be supplemented.   Mr. Brown had received a comment from Becker regarding internet usage during an informal performance review in July 2007.  Ex. F (Frank Brown's Response to Performance Review).  Other than that comment, and the notation on the 2008 employee review, no one ever indicated Mr. Brown was using the internet too much at work.  Ex. A (Brown Depo. 45:1-12; 150:22 – 151:1); Ex. B (Declaration of Frank Brown).

19.     Uncontroverted.

20.     Controverted.   As of July 2008, when the employee evaluation was presented to Mr. Brown, no co-workers or supervisors had ever told Mr. Brown that he handled his calls in an inappropriate manner.   Ex. F (Frank Brown's Response to Performance Review).

21.     Uncontroverted but must be clarified and supplemented.   Mark Eaker testified that Dave Hoelting and *one other employee* indicated that Mr. Brown would jump into a conversation uninvited.  Ex. A (Eaker Depo. 38:14-19).   Further, Mr. Eaker testified that he did nothing in response to the complaint.  Ex. C (Eaker Depo. 39:1-5).

22.     Uncontroverted but must be supplemented.   The performance review prepared by Ms. Becker indicates Mr. Brown was "[a]ble to complete varied projects in a timely manner."   See Defendants Ex. 7 (July 2008 Performance Review).

23.     Uncontroverted to the extent that Ms. Becker may have felt concerned. However, Ms. Becker did not include any of these concerns in her performance review of Mr. Brown, nor did she ever raise any of these concerns with Mr. Brown.   See Defendants Ex. 7 (July 2008 Performance Review); Ex. B (Declaration of Frank Brown). Further, Mr. Brown denies being disruptive in QA meetings, taking extended lunches and not paying attention in training sessions.  Ex. B (Declaration of Frank Brown).

24.     Controverted.   Mark Eaker testified that the only complaint he recalled receiving regarding Frank Brown was in regard to Mr. Brown jumping into conversations.  Ex. C (Eaker Depo. 38:14-19; 43:10-17).

25.     Uncontroverted.

26.     Controverted in part.   Ms. Becker's e-mail to Mr. Brown does not indicate that he failed to complete the project on time but simply requests a status update and

Mr. Brown testified that he did not recall it being failed to be completed on time. Additionally, Brown did not "blame" lack of progress on customers.  He indicated in his e-mail response to Ms. Becker and Mr. Eaker that he had had some difficulty getting some of the sites to participate but indicated that he would go through the list again and would note sites which did not want to participate as Eaker requested.  See, Defendants Ex. 11 (E-mail correspondence); Ex. A (Brown Depo. 47:11-17).

27.-31.  Uncontroverted.

32.     Uncontroverted but must be supplemented.  Following his exit interview with Shane Coughlin, Eaker represented to Brown that he didn't see anything that concerned him and that Mr. Brown was "safe."  Ex. G (Email Correspondence between Mark Eaker and Frank Brown); Ex. C (Eaker Depo: 50:25 – 51:25).

33.-38.  Uncontroverted.

39.     Uncontroverted but must be supplemented.  At the time of Ms. Becker's e-mail to Mr. Brown, the scorecard system had only been in use for approximately two weeks due to problems with implementation.  Ex. A (Brown Depo. 158:8-17).

40.     Uncontroverted but must be supplemented.  See SOF 39.

41.     Uncontroverted but must be supplemented.  The purpose of the e-mail was (1) to determine who Brown reported to and (2) to request time off to care for his newborn while his wife had a doctors appointment for post partum complications.  Ex. B (Declaration of Frank Brown).

42.-46.  Uncontroverted.

47.     Controverted in part.  Mr. Brown denies that he ever slammed his hands down, or in any way touched, Mr. Somers' desk.  Ex. A (Brown Depo. 55:7-13).  Mr.

Brown acknowledges that he raised his voice to Mr. Somers after Mr. Somers raised his voice, but Mr. Brown immediately apologized and did not do it again.   Ex. A (Brown Depo. 55:21 – 56:1; 179:13-15).

      48-52. Uncontroverted.

      53.    Uncontroverted but must be supplemented.  See SOF 141-149.

      54-57. Uncontroverted.

      58.    Uncontroverted but must be supplemented.  See SOF 152.

      59-61. Uncontroverted.

      62.    Uncontroverted but must be supplemented.   Page 13 provides the following regarding FMLA, in its entirety:

> If an employee is eligible for FMLA benefits, they may use their accumulated PTO for a work absence due to conditions outlined by the Family Medical Leave Act.  This leave may be paid or unpaid depending on: (1) the remaining balance of the employee's PTO account; and (2) participation in short-term disability insurance and meeting the plan's qualifying conditions.  For more information, contact the Human Resources Department directly.

See Defendants Ex. 18 (ScriptPro Employee Handbook).   Regarding this paragraph, Shane Coughlin testified:

> Q:  Is this the entirety of ScriptPro's police regarding FMLA?
>     . . .
> A:  . . . But is that our FMLA policy?  I'd say – I wouldn't think it's that – I doubt you could summarize FMLA in one paragraph.

Ex. D (Coughlin Depo. 27:18 – 28:5).

      63.    Uncontroverted but must be supplemented.  See SOF 62.  Mr. Brown was never advised by anyone at ScriptPro, and it was not contained in the Employee Handbook, that he was entitled to up to 12 weeks of FMLA leave or how to apply for FMLA leave.  Ex. A (Brown Depo. 143:7-22).

64.     Controverted.   Brown did not receive any additional information about FMLA other than what was contained in the employee handbook.  Ex. B (Declaration of Frank Brown).

65.     Uncontroverted.

66.     Uncontroverted.

67.     Uncontroverted but must be supplemented.  This policy is not reflected in the employee handbook.  See, Defendants Ex. 18 (ScriptPro Employee Handbook).

68.     Controverted in part.   It is uncontroverted that that was Mr. Brown's deposition testimony but, as discussed below, there are other facts which support Mr. Brown's retaliation claim.  See, SOF 117 – 119, 145 – 152.

69.     Controverted.  Mr. Brown was requesting time off and in the November 19, 2008 e-mail to Ms. Becker specifically notes that he needed "to leave by 2:00" and that he could "take PTO" for the time he missed.  See, Defendants Exhibit 14; Ex. 1 (Brown Depo. 59:12-17).   In the meeting with Becker and Somers later on November 19, 2008, Mr. Brown raised the option of working from home as he had seen women do following the birth of their children.  Ex. B (Declaration of Frank Brown).

70.     Controverted in part.  In response to Mr. Brown's request to work from home, Mr. Somers told Mr. Brown to go back to his desk and get back to work, which Mr. Brown understood to be a denial.  Ex. A (Brown Depo. 81:6 – 82:3).

71.     Uncontroverted but must be supplemented.  Mr. Brown did not have an opportunity to speak with Shane Coughlin in the time between his November 19, 2008 meeting with Al Somers and his November 21, 2008 termination.  Ex. A (Brown Depo. 83:24 – 84:8).

72.     Controverted.  Brown informed his supervisor that he needed to take time off to care for his wife and newborn child.  Ex. C (Eaker Depo: 44:11-20); Ex. A (Brown Depo 59:12-17; 147:9-14).

73.     Uncontroverted to the extent that the Human Resources department never formally denied Brown FMLA leave.  However, when he spoke with Somers regarding his need for time off he was told to "go back to his desk," he did not get to take the time needed for his wife's doctor appointment, and his employment was terminated two days later.  Ex. A (Brown Depo. 62:8-10, 20-25); Ex. B (Declaration of Frank Brown).

74.-78.  Uncontroverted.

79.     Uncontroverted but must be supplemented.  See SOF 71.

80.-86.  Uncontroverted.

87.     Controverted.  Kimberly Cygan was also a customer service operations analyst, like Mr. Brown, who also reported to Tammy Becker.  Ex. A (Brown Depo. 36:1-18; 90:14-19); Ex. D (Coughlin Depo: 67:24 – 68:1).

88.-93.  Uncontroverted.

94.     Uncontroverted but must be supplemented.  See SOF 137.

95.     Uncontroverted.

96.     Uncontroverted.

97.     Controverted.    The ScriptPro Employee Handbook does not contain instruction for reporting overtime.  See, Defendants Ex. 18 (ScriptPro Employee Handbook).

98.     Controverted.  Mr. Brown had worked out an arrangement with Mark Eaker whereby Mr. Brown would do overtime from home so that when his son was born

he would have some flex time to be able to help his wife and new baby.  Ex. A (Brown Depo. 58:5-23).   Further, Shane Coughlin recalled a conversation with Mark Eaker whereby they discussed that Mr. Brown was downloading reports from home.  Ex. D (Coughlin Depo. 53:7-25).

99.    Controverted.  See SOF 98.

100.   Controverted.  See SOF 98.

## B.  Additional Facts

101.   ScriptPro employs approximately 700 employees.  Ex. D (Coughlin Depo. 9:10-11).

102.   The Customer Service Operations Analyst position required a bachelors degree and 3-5 years of experience in customer service. Ex. H (Job Posting).

103.   Frank Brown has a bachelor of science in business management and has had several years of customer service experience from previous employment at Saint Luke's Health System, L.H.E., P.A. and Gateway, Inc..  Ex. A (Brown Depo. 25:11-19; 18:13 – 20:24); Ex. I (Resume of Frank Brown).  In fact, Mr. Brown spent several years on call center work, handling client escalation and retention accounts.  Ex. A (Brown Depo. 18:13 – 20:24) ; Ex. I (Resume of Frank Brown).

104.   Frank Brown's regular work hours were Monday through Friday, from 8:00 a.m. until 5:00 p.m.  Ex. A (Brown Depo. 32:21-25).

### OVERTIME

105.   Page 9 of the ScriptPro Employee Handbook contains a policy regarding overtime pay.  See, Defendants Ex. 18 (ScriptPro Employee Handbook).

106.   Overtime must be authorized in advance by an employee's supervisor. See, Defendants Ex. 18 (ScriptPro Employee Handbook).  Mark Eaker had the authority to authorize overtime.  Ex. C (Eaker Depo. 19:18-23).

107.   Eaker authorized Brown to run reports from home in order to have more time off when his child was born.  Ex. B (Declaration of Frank Brown).

108.   Plaintiff's wife, Jessica Brown, observed Plaintiff working at home in the evenings on several occasions.  Ex. J (Declaration of Jessica Brown).

## LEAVE

109.   ScriptPro employees accrue Paid Time Off (PTO) as a standard benefit of employment.   Ex. E (Williams Depo. 28:20-25); See, Defendants Ex. 18 (ScriptPro Employee Handbook).

110.   When a ScriptPro employee seeks to use PTO, the employee makes the request to their supervisor.  Ex. C (Eaker Depo. 18:1-6).

111.   Human Resources is not involved in arranging for an employee to use PTO.  Ex. E (Williams Depo. 21:13-15).

112.   ScriptPro does not instruct supervisors regarding how to handle FMLA issues raised by employees.  Ex. E (Williams Depo. 19:22 – 20:2).

113.   Frank Brown approached Mark Eaker regarding needing some time off to take care of his wife and children.  Ex. C (Eaker Depo. 44:11-20).

114.   Eaker did not advise Brown to talk to Debbie Williams regarding FMLA. Ex. C (Eaker Depo. 45:9-19).

115.   Mr. Eaker did not advise Brown that he may be eligible for FMLA.  Ex. C (Eaker Depo. 45:14-16).

116.   Eaker approved Brown to take one week of PTO following the birth of his child.  Ex. C (Eaker Depo. 45:2-8); Ex. A (Brown Depo 66:16-23).   Eaker further approved Brown to work from home for a week following the birth of his child.  Ex. A (Brown Depo 66:16-23).

117.   On November 17, 2008, Plaintiff had a conversation with Al Somers regarding who his new supervisor would be, his arrangement with Mark Eaker and his need to occasionally take some time off to help care for his wife and newborn, including a few hours later that week.  Ex. B (Declaration of Frank Brown).

118.   On November 19, 2008, Plaintiff emailed Tammy Becker regarding his need to occasionally take time off because he had still not yet received a response from Somers.  Ex. B (Declaration of Frank Brown).

119.   Also on November 19, 2008, Plaintiff met with Becker and Somers and again indicated his arrangement with Eaker and his need to occasionally take time off to care for his wife and newborn.  Ex. A (Brown Depo. 162:15-19).  In this meeting, Mr. Brown also raised the option of working from home as other, female, employees had following the birth of a child.  Ex. B (Declaration of Frank Brown).

120.   Neither Somers nor Becker advised Brown that he should apply for FMLA leave or that he should speak with Debbie Williams in Human Resources.  Ex. A (Brown Depo. 162:22 – 163:10).

121.   If Mr. Brown had known that he was eligible for FMLA leave, he would have applied for intermittent leave for the time he needed following the birth of his child.  Ex. A (Brown Depo. 79:15-19); Ex. B (Declaration of Frank Brown).

**EMPLOYEE EVALUATION**

122.   In Brown's written performance review, "Quality of Work – Customer Service" was marked "MR" on the rating scale, which is explained on the review as, "Meets job requirements in a fully satisfactory manner," and "Attendance" was marked "RE" on the rating scale, which is explained on the review as, "Rarely equaled in exceeding job requirements."  See, Defendants Ex. 7 (July 2008 Performance Review).

123.   In Brown's written performance review, "Planning & Organization of Work" which is described as "Accuracy and completeness of work in a timely manner" is marked "MM" on the rating scale, which is explained on the review as, "Marginal performance which must be improved."  However, the corresponding comment section indicates Brown was "[a]ble to complete varied projects in a timely manner."  See, Defendants Ex. 7 (July 2008 Performance Review).

124.   In Brown's written performance review, Brown received the following comments about his quality of work:

> Still in the learning process of his job (retaining info).  When given an assignment *he does perform solid steady work* but would like to see more initiative and motivation in his role.  *He did take the initiative in developing with Kristin a soft skills program for the help desk which was well done.*

See Defendants Ex. 7 (July 2008 Performance Review) (emphasis added).

125.   Prior to the July 2008 Performance Review, no co-workers nor supervisors had made any comments to Brown regarding his work performance or interactions with co-workers.   Ex. F (Frank Brown's Response to Performance Review); Ex. B (Declaration of Frank Brown).

126.    Mark Eaker expressed to Mr. Brown that he did not agree with Ms. Becker's comments in the work relationships area because he had not seen those activities or behaviors.  Ex. A (Brown Depo. 43:21-23).

127.    Eaker did not find Mr. Brown to be argumentative or abrasive.  Ex. C (Eaker Depo. 38:2-5).

128.    Whenever an employee received an unsatisfactory evaluation, the supervisor and Eaker would outline some tasks or goals for the employee to achieve within a set time frame and those goals would be documented on the employee's written evaluation.  Ex. C (Eaker Depo. 29:6 – 30:1).

129.    If an employee was given certain goals to complete, Eaker would typically give the employee some type of verbal feedback regarding their progress.  Ex. C (Eaker Depo. 30:2-7).

130.    Brown's written employee evaluation contains no such tasks or goals for improvement.  See, Defendants Ex. 7 (July 2008 Employee Review).

131.    Brown did not receive any feedback from Becker or Eaker following his evaluation.  Ex. B (Declaration of Frank Brown); See also Ex. G (Email correspondence between Brown and Eaker).

132.    Just prior to Eaker's resignation, he exchanged e-mails with Mr. Brown wherein Mr. Eaker indicated that he did not see anything that concerned him and that he had already talked to Shane Coughlin and Mr. Brown was safe.  Ex. G: (E-mail correspondence between Brown and Eaker).

## ARRANGEMENT WITH EAKER

133.    In March 2008, Plaintiff approached Eaker and informed him that Plaintiff's wife was pregnant.  Ex. C (Eaker Depo. 44:4-10); Ex. A (Brown Depo. 37:24-25); Ex. B (Declaration of Frank Brown).

134.    In that same March 2008 conversation, Plaintiff indicated that he would need time off when the baby arrived in order to help care for his wife and children.  Ex. C (Eaker Depo. 44: 11-18); Ex. B (Declaration of Frank Brown).

135.    Plaintiff and Eaker worked out an arrangement whereby Plaintiff would run performance reports for two pharmacy chains from home in the evenings once a month and he would be able to take some additional time off when the baby was born without having to use PTO.  Ex. B (Declaration of Frank Brown).

136.    The performance reports had to be run after business hours because they concerned the performance of a robot and could not be run while the robot was working.  Ex. A (Brown Depo. 95:9-18).

137.    Shane Coughlin testified that he recalled a conversation with Mark Eaker regarding Mr. Brown downloading reports from home and acknowledged that they were legitimate projects.  Ex. D (Coughlin Depo. 53:7-23).

138.    Plaintiff understood that his work-from-home time would be paid out later by taking some additional time off or by allowing Plaintiff to do some work from home after the birth of his child.  Ex. A (Brown Depo. 92:23 – 94:3).  As such, Mr. Brown did not record his overtime in KRONOS.  Ex. B (Declaration of Frank Brown).

139.    Plaintiff did not record his time worked from home.  Ex. A (Brown Depo. 94:12-15).

140.   Plaintiff estimates that he ran reports from home for a total of approximately 80 hours from July 2008 through October 2008.  Ex. A (Brown Depo. 94:6-8); Ex. 10 (Declaration of Jessica Brown).

141.   On November 19, 2008, Plaintiff informed Al Somers that he had been running reports from home and that he had been allowed to do so to accrue flex time for when his child as born.  Ex. A (Brown Depo. 161:18-23).

**TERMINATION**

142.   In the week prior to Mr. Brown's termination, Tammy Becker went to Shane Coughlin and indicated that Mr. Brown had stopped reporting to work.  Ex. D (Coughlin Depo. 71:10-13; 73:22-25).

143.   After meeting with Becker, Coughlin reviewed the 2008 employee review for the first time.  Ex. D (Coughlin Depo. 71:19-25).

144.   Coughlin testified that his conversation with Becker and review of the employee evaluation "tainted my whole view of where we're going with this because I had an employee – employee that clearly had issues and had been called out on those issues and hadn't apparently responded very well to the whole thing."  Ex. D (Coughlin Depo. 72:2-7).

145.   In the week prior to Mr. Brown's termination, Al Somers also came to Coughlin regarding Mr. Brown.  Ex. D (Coughlin Depo. 74:10-14).  Somers informed Coughlin of the November 19, 2008 meeting.  Ex. D (Coughlin Depo. 78:3-20).

146.   Coughlin did not speak with Frank Brown regarding any of the alleged performance issues raised by Becker or Somers.  Ex. D (Coughlin Depo. 86:14-16).

147.    Coughlin did not speak with Mark Eaker regarding any of the alleged performance issues raised by Becker prior to terminating Mr. Brown's employment.  Ex. D (Coughlin Depo. 88:25 – 89:3); Ex. C (Eaker Depo. 54:5-7).

148.    Other than Becker and Somers, Coughlin did not consult with any other employee's in Mr. Brown's group when determining whether to terminate Mr. Brown's employment.  Ex. C (Coughlin Depo. 89:6-13).

149.    The only document which Mr. Coughlin consulted in determining whether to terminate Mr. Brown's employment was the 2008 employee review prepared by Becker.  Ex. C (Coughlin Depo. 83:24 – 84:8).

150.    Coughlin did not fill out the exit interview form for Brown's termination but did sign it as Brown's supervisor.  Ex. C (Coughlin Depo. 84:21 – 85:7).

151.    In the November 19, 2008, meeting between Plaintiff, Tammy Becker and Al Somers, no comments were made regarding any deficiencies with Plaintiff's work or his demeanor with co-workers.  Ex. A (Brown Depo. 163:11-17).

152.    On November 21, 2008, Plaintiff was asked to come to a meeting with Al Somers and Debbie Williams.  Ex. A (Brown Depo. 164:11 – 165:11).

153.    The first thing that Somers said when Plaintiff entered the meeting was "this has absolutely nothing to do with what happened earlier in the week."  Ex. A (Brown Depo. 165:23 – 166:1).

154.    Mr. Brown requested Somers provide him with documentation of his poor performance and was denied.  Ex. A (Brown Depo. 64:7-12).

## ARGUMENTS AND AUTHORITIES

In deciding a motion for summary judgment, the court must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Garrett v. Hewlett-Packard Company*, 305 F.3d 1210, 1216 (10th cir. 2002). In considering whether there are any genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." *Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996). In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 150 (2000). The nonmoving party must be given "wide berth to prove a factual controversy exists." *Jeffries v. State of Kan.,* 147 F.3d 1220, 1228 (10th Cir. 1998).

As discussed in detail below, a reasonable jury, when faced with the evidence presented here, could return a verdict in favor of Mr. Brown on all four of his claims. Consequently, ScriptPro's motion for summary judgment must be denied in its entirety.

## I. INTERFERENCE WITH FMLA RIGHTS

The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). A prima facie case of interference requires a showing that (1) plaintiff was entitled to FMLA leave; (2) that an adverse action by the employer interfered with plaintiff's right to take FMLA leave; and (3) that the employer's adverse action was

related to the exercise or attempted exercise of plaintiff's FMLA rights.  *Moss v. Blue Cross*, 534 F. Supp. 2d. 1190, 1200 (D.Kan. 2008).  "[T]he employer bears the burden of proof on the third element of an interference claim once the plaintiff has shown her FMLA leave was interfered with."  *Campbell v. Gambro Healthcare, Inc.,* 478 F.3d 1282, 1287 (10th Cir. 2007).  Under this theory, Plaintiff has the burden to show entitlement to FMLA leave, but need not show the employer's intent to interfere with FMLA leave. *Moss,* 534 F.Supp. at 1999.

> **A.     Mr. Brown was Entitled to FMLA Leave.**

An employee is "eligible" for leave under the FMLA if he has been employed for at least twelve months by the employer and has worked at least 1,250 hours for the employer during the previous twelve-month period.  *Defreitas v. Horizon Inv. & Mgmt Corp.*, 577 F.3d. 1151, 1159 (10th Cir. 2009), citing 29 U.S.C. § 2611(2).  For FMLA purposes, the term "employer" means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees.  29 U.S.C. § 2611(4).  An eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for several reasons, including because of the birth of a son or daughter of the employee and in order to care for such son or daughter, or to care for a spouse with a serious health condition.  29 U.S.C. § 2612(1).  The term "serious health condition" means a . . . physical condition that involves. . . continuing treatment by a health care provider.  29 U.S.C. § 2611(11).

ScriptPro manufactures automated systems for pharmacies and employs approximately 700 employees.  Plaintiff began his employment with ScriptPro in March 2007.  As of October 2008, when his child was born, Plaintiff had been employed for

nearly nineteen months regularly working forty hours per week.  As such, ScriptPro is an employer subject to the FMLA, and Plaintiff had met the minimum eligibility requirements.

Defendant asserts that Plaintiff was not eligible because he did not provide proper notice of his need for FMLA.  Defendant is correct that FMLA regulations provide that "[a]n employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on an expected birth."  29 C.F.R. 825.302(a).  However, the regulations go on to provide that "[i]n those cases where the employee is required to provide at least 30 days notice of foreseeable leave and does not do so, the employee shall explain the reasons why such notice was not practicable upon a request from the employer for such information.  Id.  At no point does the regulation say that failure to provide 30 days notice disqualifies an employee from entitlement to FMLA leave.

Mr. Brown first went to his supervisor in March 2008 and indicated that his wife was pregnant and that he would need time off when the baby was born to help care for his wife and child.  SOF 126 and 127.  This alone qualifies as notice to the employer.  The FMLA does not require a covered employee to specifically ask for FMLA benefits.  In fact, an employee need not expressly assert rights under the FMLA or even mention the FMLA.  *Moss*, 534 F.Supp.2d at 1200; see, also, 29 C.F.R. 825.302(c); *Zhu v. Fed. Hous. Fin. Bd.*, 389 F.Supp.2d 1253, 1289 (D.Kan. 2005); *Tate v. Farmland Indus.*, 268 F.3d 989, 997 (10th Cir. 2001).  This notice was given approximately 6 months prior to the needed leave.  As it relates to the time requested in November 2008 to assist his wife during her doctor's appointment, Plaintiff e-mailed two supervisors several days

prior to the needed time – which was only a couple of hours – to request the leave. Neither of these individuals requested Plaintiff to provide any information as to why the notice was not provided 30 days prior.

Once an employer is on notice that an employee might be eligible for FMLA benefits, the employer has a duty to notify the employee that the FMLA might apply. *Zhu*, 389 F.Supp.2d at 1289; see, also, 29 C.F.R. 825.208(a); *Tate*, 268 F.3d at 997. Mark Eaker acknowledged that Plaintiff came to him regarding needing time off to care for his wife and new child and further admits that he did not advise him that FMLA may apply to his request.  SOF 133 & 134.  Nor did Mr. Eaker recommend that Plaintiff talk to Debbie Williams in Human Resources.  SOF 114.  Later, when Plaintiff requested time off to assist his wife with a doctor's appointment for post partum complications, neither Tammy Becker nor Al Somers advised him that his request may be FMLA eligible, nor did either ever refer Mr. Brown to Debbie Williams.  In fact, no one at ScriptPro ever advised Plaintiff that he may be eligible for FMLA.  FMLA regulations provide that "failure to follow the notice requirements set forth in [825.300] may constitute an interference with, restraint or denial of the exercise of an employee's FMLA rights."  29 C.F.R. 825.300(e).

ScriptPro argues that by providing Plaintiff with an employee handbook and posting FMLA fliers in break rooms, that Plaintiff was sufficiently informed of his rights. First, this argument is directly contradictory to the affirmative employer notice requirements contained in 29 C.F.R. 825.300.  Further, the "notice" provided by the employee handbook is clearly deficient.  It reads, in its entirety:

> If an employee is eligible for FMLA benefits, they may use their
> accumulated PTO for a work absence due to conditions outlined by

> the Family Medical Leave Act.  This leave may be paid or unpaid depending on: (1) the remaining balance of the employees PTO account; and (2) participation in short-term disability insurance and meeting the plan's qualifying conditions.  For more information, contact the Human Resources Department directly.

The "notice" in the employee handbook does not provide any information regarding what makes an employee eligible for FMLA benefits, or what those benefits may be. Notably, the "notice" does not specify how to apply for FMLA, and does not specify that an employee can only apply for FMLA by contacting a particular individual.  Rather, it simply indicates that an employee can contact human resources if they want more information.  It is also worth noting that the "notice" in the employee handbook may do more to confuse employees rather than assist by virtue of the reference to PTO.  At ScriptPro, an employee's use of PTO is handled by scheduling the PTO directly with his or her supervisor without the involvement of human resources.  Even if the employee handbook adequately informs employees of their rights – which Plaintiff denies – it would not be unreasonable, based upon the language in the employee handbook, for an employee to construe the "notice" as requiring FMLA to be handled with a supervisor contemporaneously with a request for PTO.

   **B.   The Adverse Action by ScriptPro Was Related to Mr. Brown's FMLA Rights**

It is undisputed that Plaintiff's employment was terminated.  Termination of employment has long been recognized as an adverse employment action.  See, e.g. *Hillig v. Rumsfeld*, 381 F.3d 1028 (10th Cir. 2004).  In determining whether the termination "related to" the exercise or attempted exercise of FMLA rights, the Tenth Circuit, in *DeFreitas,* found the timing to be particularly suggestive.  577 F.3d at 1160. There, Ms. DeFreitas was terminated one day after she informed her supervisor that

she would need a full six weeks of leave.  Id.  The timing of Mr. Brown's termination is similarly suggestive.  Mr. Brown was terminated four days after his first conversation with Mr. Somers and a mere two days after his emails and meeting with Tammy Becker and Al Somers, wherein he indicated, among other things, that he needed time off to care for his wife and new baby.  Further, as noted above, failure to comply with the employer notice requirements alone may constitute interference.  No one at ScriptPro ever informed Mr. Brown of his eligibility – or even potential eligibility – as required by the regulations.  As a result, Mr. Brown addressed his needs with his supervisor in conjunction with his request for PTO.  However, had he known that he was eligible and that it was available, he would have applied for intermittent FMLA leave.  SOF 121.  Regardless, in an interference claim, Plaintiff need only show his entitlement to FMLA, not an employer's intent.  *Moss*, 534 F.Supp.2d at 1999.  Plaintiff has clearly demonstrated that he was entitled to FMLA.

### C.   ScriptPro's Proffered Reason for Termination is Pretext

Plaintiff does not dispute that the Tenth Circuit has often found that an employee who is entitled to FMLA leave may nevertheless be terminated if there is no causal connection between the termination and his rights under the FMLA.   29 C.F.R. 825.216(a); *Satterlee v. Allen Press, Inc*. 274 Fed.App. 642, 645 (10th Cir. 2008).  Once a plaintiff has proved that his employer has interfered with his right to take FMLA leave, the employer bears "the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."  *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1289 (10th Cir. Kan. 2007).  Because the burden of proving this affirmative defense at trial is on the

employer, the standard at the summary judgment stage is particularly strict.   As this

court explained in *Conoco, Inc. v. Huber Corp.,* 148 F. Supp. 2d 1157 (D. Kan. 2001):

> 'The standard [under Rule 56] is particularly strict when such
> a ruling is made in favor of the party with the burden of
> proof.'   *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir.
> 1996).   Under this strict test, the party bearing the burden of
> proof at trial earns a favorable ruling only when evidence is
> presented that 'the jury would not be at liberty to disbelieve.'
> *Weese*, 98 F.3d at 547.

148 F. Supp. 2d at 1165, n. 7.

ScriptPro alleges that Mr. Brown was terminated for "unresolved work

performance issues."   However, this explanation is pretext.   A plaintiff can show pretext

by pointing to such "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence."   *Moss*, 534

F.Supp.2d at1203.   A plaintiff typically makes a showing of pretext in one of three ways:

(1) evidence that defendant's stated reason for the adverse employment action was

false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written

company policy prescribing the action to be taken under the circumstances; or (3)

evidence that defendant acted contrary to an unwritten policy or contrary to company

practice when making the adverse employment decision affecting plaintiff.   Id.

A reasonable jury could find that ScriptPro's proffered reason for the termination

is unworthy of belief.   ScriptPro asserts that Plaintiff was terminated for "unresolved,

previously discussed performance issues."   However, the one written performance

evaluation which was completed indicates that "when given an assignment he does

perform solid steady work" and that Plaintiff was "able to complete varied projects in a

timely manner."  On the performance review, his quality of work was rated as "meets job requirements in a fully satisfactory manner."  In fact, the only negative comments on the written performance evaluation are a note regarding internet usage and some allegations regarding Plaintiff's interactions with his co-workers – both of which were refuted by Plaintiff in his response to the performance evaluation.  Mark Eaker testified that he never found Plaintiff to be argumentative and abrasive as indicated.  Further, none of the issues that are reflected in the performance review were ever "previously discussed" with Plaintiff.   Tammy Becker has indicated in an affidavit that she addressed these issues with Plaintiff as they occurred, but Mr. Brown denies that any issue regarding interaction with co-workers was ever brought to his attention.  Further, Ms. Becker's comment to Plaintiff regarding his internet usage was made shortly after he started his employment and was made in the context of needing to find more work to keep Plaintiff busy – which is further reflected on the 2008 written performance evaluation.

In addition to the inconsistency between the proffered reason and Plaintiff's employee evaluation, ScriptPro acted contrary to its company practice regarding Mr. Brown's "unsatisfactory" evaluation.   Mark Eaker testified that when an employee received an unsatisfactory evaluation, the supervisor and employee would sit down and draft a list of goals or tasks to be completed within a specified time frame and that this would be reflected on the employee's evaluation.  The employee would then receive feedback on their progress.  This was not done for Mr. Brown.  Mr. Brown's employee evaluation contains no goals to be completed and Mr. Brown received no further feedback from any member of ScriptPro management regarding resolution of his

"performance issues."  In late October 2008, Mark Eaker informed Plaintiff that he was "safe" and everything was taken care of.  In fact, prior to being informed that he was being terminated for "previously discussed, unresolved performance issues" on November 21, 2008 – two days after informing his supervisors about his arrangement with Mark Eaker and requesting time off to help care for his wife and newborn – no one had brought any performance issues to Plaintiff's attention.  In *Moss*, the Court found that similar evidence, coupled with the close temporal proximity of the termination was sufficient to raise a fact issue of pretext.  Likewise, here, ScriptPro has not carried its burden in proving that Mr. Brown's termination was for reasons unrelated to his request for leave.  A reasonable jury could choose to disbelieve ScriptPro's proffered reason for termination, and, as such, summary judgment must be denied.

## II. <u>RETALIATION FOR EXERCISING RIGHTS UNDER THE FMLA</u>

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  In order to establish a prima facie case of FMLA retaliation, Plaintiff must demonstrate that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the two actions.  *Moss*, 534 F.Supp.2d at 1202; *Satterlee*, 443 F.Supp.2d at 1245.  In establishing the third element, the critical inquiry at the prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."  *Moss*, 534 F.Supp.2d at 1202.  In this case, there is no dispute

that Plaintiff's employment was terminated, SOF 54, so for purposes of summary judgment, Plaintiff will focus on the first and third elements of his prima facie case.

### A.    Plaintiff availed himself of a protected right under the FMLA

Mr. Brown availed himself of a protected right under the FMLA by requesting leave in order to care for his wife and newborn.  The FMLA does not require a covered employee to specifically ask for FMLA benefits.   In fact, an employee need not expressly assert rights under the FMLA or even mention the FMLA.  *Moss*, 534 F.Supp.2d at 1200.  When requesting leave, the employee need not expressly assert his or her rights under the FMLA or even mention the FMLA, so long as he or she provides the employer sufficient information to determine that the FMLA might be invoked.  *Zhu*, 389. F.Supp.2d. at 1289.  Mr. Brown first requested FMLA leave when, several months prior to the birth of his child, he talked to his supervisor, Mark Eaker, about needing to take some time off when the baby was born to care for his wife and child.   Subsequently, on November 17, 2008, Mr. Brown had a conversation with another supervisor, Al Somers, and indicated that he would need some time off later that week because his wife had a doctor's appointment for post partum complications. When he did not receive a response from Mr. Somers regarding whether he could take time off to assist his wife and care for his children, Mr. Brown sent an e-mail to Tammy Becker, another supervisor, again indicating that he needed to take some time off.

ScriptPro is correct that Mr. Brown never used the magic words "FMLA leave," but the Tenth Circuit has been very clear that he did not have to.   In *Zhu*, the Court determined that when Plaintiff told her supervisor that she was suffering from post traumatic stress disorder and depression, that was sufficient information from which the

employer might conclude that Plaintiff might want to invoke FMLA.  389 F.Supp.2d. at 1289.  The same is true in this case.  By informing his supervisors that he needed time away to care for his wife and newborn child, Mr. Brown gave his employer sufficient information to determine that FMLA might be invoked.  As such, regardless of whether the words "FMLA leave" were used, Mr. Brown requested FMLA leave and thus availed himself of a protected right under the FMLA.

### B.  The Circumstances of Plaintiff's Termination Give Rise to an Inference of Unlawful Discrimination.

The circumstances of Mr. Brown's termination, coupled with the close temporal proximity between protected activity and the termination, gives rise to an inference of unlawful discrimination.   The Tenth Circuit has long recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive.  *Moss*, 534 F.Supp.2d. at 1202-03.  For example, the Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. Colo. 1999) citing *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1991).  The time period in this case is much shorter, a mere four days after Mr. Brown first spoke with Al Somers regarding needing time off and two days after Mr. Brown emailed Tammy Becker and again spoke with Mr. Somers.

### C.  ScriptPro's Reason for Termination is Pretext

To defeat summary judgment, Plaintiff must show that there is a genuine dispute of material fact as to whether Defendant's explanations for terminating his employment is pretextual.  *Moss*, 534 F.Supp.2d. at 1203.  To raise a fact issue of pretext, Plaintiff

must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.   Id.   A plaintiff can show pretext by pointing to such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.   Id.   A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.   Id.

As previously discussed, a reasonable jury could find that ScriptPro's proffered reason for the termination is unworthy of belief.   ScriptPro asserts that Plaintiff was terminated for "unresolved, previously discussed performance issues."   However, the one written performance evaluation which was completed is wholly inconsistent with this rationale and indicates that "when given an assignment he does perform solid steady work" and that Plaintiff was "able to complete varied projects in a timely manner."   On the performance review, his quality of work was rated as "meets job requirements in a fully satisfactory manner."   The only negative comments on the written performance evaluation are a note regarding internet usage and some allegations regarding Plaintiff's interactions with his co-workers – both of which were refuted by Plaintiff in his response to the performance evaluation.   Further, none of the issues that are reflected in the performance review were never "previously discussed" with Plaintiff.   Subsequent to the

performance review, Tammy Becker emailed Mr. Brown and requested that he correct errors on several scorecards.  However, this was a system that had only been in use for only approximately two weeks at that time and there no discipline or other adverse action as a result of the errors.

In addition to the inconsistency between the proffered reason of "performance issues" and the comments on Plaintiff's employee evaluation, ScriptPro did not follow it's own company practice regarding this allegedly unsatisfactory evaluation.  Mark Eaker testified that when an employee received an unsatisfactory evaluation, the supervisor and employee would sit down and draft a list of goals or tasks to be completed within a specified time frame and that this would be reflected on the employee's evaluation.  The employee would then receive feedback on their progress.  This was not done for Mr. Brown.  Mr. Brown's employee evaluation contains no goals to be completed and Mr. Brown received no further feedback from any member of ScriptPro management regarding resolution of his "performance issues."  Having received no additional feedback after the July 2008 evaluation, Mr. Brown e-mailed Mr. Eaker prior to Mr. Eaker's resignation in late October 2008.  In response, Mark Eaker informed Plaintiff that he "didn't see anything that concerned him," that Mr. Brown was "safe" and everything was "taken care of."  As previously noted, the *Moss* Court found that similar evidence, coupled with the close temporal proximity of the termination was sufficient to raise a fact issue of pretext.  Likewise, here, a reasonable jury could choose to disbelieve ScriptPro's proffered reason for termination.  As such, summary judgment must be denied.

ScriptPro next argues that Plaintiff cannot show pretext because "there is not a shred of evidence to justify an inference of retaliatory motive on the part of the person responsible for terminating Brown's employment," Shane Coughlin.  However, the Tenth Circuit has often found an employer liable for a subordinate employee's prejudice even if the decision-maker lacked the required intent where the decision-maker failed to independently investigate the subordinate's complaint against the former employee and instead merely followed the biased recommendation of the subordinate.  *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1179 (10th Cir. 2006) (fn 7).  This is often referred to as "subordinate bias" or the "cat's paw theory" of liability.  To prevail on a subordinate bias claim, a plaintiff must establish more than mere influence or input in the decision making process.  Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action.  *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1060 (10th Cir. 2009).  An employer can avoid liability by conducting an independent investigation of the allegations against an employee, including simply asking an employee for his version of events.  Id.   The Court goes on:

> In applying this standard at the summary judgment stage, we first ask if the plaintiff has established a "genuine issue of material fact concerning the bias of the subordinate."  Second, we ask if the plaintiff has established "genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.

Id. (internal citations omitted).

Though ScriptPro and Shane Coughlin have indicated that Mr. Coughlin was the ultimate decision-maker regarding Mr. Brown's termination, the facts are clear that it

was Tammy Becker who sought and instigated the adverse action and that Mr. Coughlin was in fact no more than a cat's paw.  Ms. Becker was the individual who completed Mr. Brown's 2008 performance review and provided unsatisfactory ratings despite indicating that Mr. Brown was "able to complete varied projects in a timely manner."  After Mr. Brown had returned from his leave and had spoken with Ms. Becker regarding his arrangement with Mr. Eaker and his need for time off to care for his wife and newborn, it was Ms. Becker who went to Mr. Coughlin and alleged that Mr. Brown was no longer reporting to work, an allegation for which there is no support.  Tellingly, when Ms. Becker went to Mr. Coughlin, she provided a copy of the "unsatisfactory" performance evaluation which she had completed but did not include a copy of the written response which Mr. Brown had submitted.  The only other individual Mr. Coughlin consulted with prior to terminating Mr. Brown's employment was Al Somers, who could only offer general comments and recounted his November 19, 2008 meeting with Mr. Brown.  Mr. Coughlin made no attempt to speak with Mr. Brown prior to terminating his employment. Likewise, Mr. Coughlin made no attempt to contact Mark Eaker, who could have told him that he never found Mr. Brown to be argumentative or abrasive as Ms. Becker claimed and would have been the more appropriate person to comment on Mr. Brown's work performance as his most recent supervisor.  Indeed, other than Ms. Becker and Mr. Somers, Mr. Coughlin made no effort to speak to anyone in Mr. Brown's work group to investigate the allegations of Mr. Brown's "unresolved, previously discussed performance issues."  Instead, a mere two days after the November 19, 2008 meeting between Mr. Brown, Mr. Somers and Ms. Becker, Mr. Coughlin simply signed off on the exit interview form, which he could not even be bothered to fill out.

Ms. Becker's actions in handling her issues with Mr. Brown, particularly after he had indicated to her that he had a previous arrangement with Mark Eaker regarding taking time off to care for his wife and child, clearly demonstrates that Ms. Becker had a bias against Mr. Brown.  Her bias is further highlighted by the inconsistencies within the performance review she completed for Mr. Brown and the testimony of Mark Eaker that he did not find Mr. Brown to be argumentative or abrasive as Ms. Becker alleged. Finally, her allegations that Mr. Brown had stopped reporting to work, despite her documented conversations with him, indicates her bias.

As previously discussed, ScriptPro's contention that Mr.  Brown's termination was for "unresolved, previously discussed performance issues" is clearly pretext and not supported by the evidence.  When evaluating the subordinate bias claim, it is clear that Ms. Becker's bias has a causal connection to Mr. Brown's termination.  Mr. Coughlin had very little interaction with Mr. Brown during his employment and had not seen the performance review prior to the time Ms. Becker came to him.  Mr. Coughlin made no attempts at an independent investigation to verify or disprove what he had been told by Ms. Becker.   Indeed, Mr. Coughlin admitted that speaking with Ms. Becker and reviewing the performance review which she had prepared "tainted [his] whole view" but he never took the basic step of even talking to Mr. Brown before terminating his employment.

Plaintiff has established that he was entitled to FMLA leave and that he properly invoked the protection of the FMLA.  Plaintiff has further presented evidence disputing the alleged performance issues which purportedly form the basis for the termination – the inconsistencies within the evaluation itself, disputed testimony regarding whether

any issues were ever discussed with Mr. Brown, and that ScriptPro failed to follow its own company policy regarding performance goals following an unsatisfactory evaluation.   This, combined with close temporal proximity, creates a genuine issue of material fact for the jury.   As such, summary judgment is inappropriate and must be denied.

### III.    DISPARATE TREATMENT IN VIOLATION OF TITLE VII

Generally to establish a prima facie case of discriminatory discharge, plaintiff must prove by a preponderance of the evidence that: (1) he belongs to a protected class; (2) he was qualified for his job; (3) he was terminated despite his qualifications; and (4) after he was discharged, his job remained open and the employer sought applicants whose qualifications were no better than his qualifications. *Lynch v. Southwestern Bell Telecommunications, Inc.*, 1992 U.S. Dist. LEXIS 12660 (D. Kan. July 31, 1992), citing *Trujillo v. Grand Junction Regional Center*, 928 F.2d 973, 977 (10th Cir. 1991).  In a reverse discrimination case, such as this one, where the plaintiff belongs to a majority group - white males - the Tenth Circuit has modified the first prong of the prima facie case: "In lieu of showing that he belongs to a protected group, [a plaintiff may] establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Wirtz v. Kan. Farm Bureau Servs.*, 311 F. Supp. 2d 1197, 1207 (D. Kan. 2004).  There are three ways plaintiff could meet his burden of proof for a reverse discrimination claim: 1) direct evidence of intentional discrimination; 2) indirect evidence under McDonnell Douglas framework by first proving sufficient background facts that defendant discriminates against the majority; or 3) indirect evidence sufficient to support a

reasonable probability that 'but for' plaintiff being male, the challenged employment decision would have favored him." *Wirtz*, 311 F. Supp. 2d at 1207.

It is undisputed that Plaintiff was terminated from his position, and that the position remained open after his termination. Therefore, for purposes of responding to Defendant's Motion for Summary Judgment, Plaintiff will focus on the first two elements.

Plaintiff was qualified for the position. The job posting for the customer service operations analyst position indicates that a bachelor's degree and 3-5 years of experience in customer service and/or quality assurance are required. Plaintiff holds a bachelor of science in business management and had several years of customer service experience from his previous employment at Saint Luke's Health System, L.H.E., P.A. and Gateway, Inc. Indeed, Plaintiff had previously spent several years doing call center work, handing client escalation and account retention. Defendants may assert that Plaintiff's July 2008 performance evaluation demonstrates that he was not qualified for the work. However, a careful review of the performance evaluation indicates no problems with his work performance. In fact, to the contrary, the performance evaluation indicates that Plaintiff was "able to complete varied projects in a timely manner" and that "when given an assignment he does perform solid steady work." The only work performance issue which ever confronted Plaintiff during his employment was when he was asked to re-do some scorecards which contained errors – in the second week of using a new system. This single incident clearly does not make Plaintiff unqualified for the work.

Plaintiff relies on two pieces of circumstantial evidence to prove his claim. The first piece of circumstantial evidence from which a reasonable jury could infer a

discriminatory animus consists of the false explanations given by ScriptPro for its termination of Plaintiff.  The sufficiency of this type of circumstantial evidence to prove discrimination was upheld by the United States Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), explaining:

> In appropriate circumstances, <u>the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.</u>  Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'

530 U.S. at 147.  Emphasis added.  See also *Desert Palace*, 538 U.S. at 100; *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

ScriptPro asserts that Plaintiff was terminated for "unresolved, previously discussed performance issues."   However, this is inconsistent with the one written performance evaluation which was completed, which indicates that "when given an assignment he does perform solid steady work" and that Plaintiff was "able to complete varied projects in a timely manner."   On the performance review, his quality of work was rated as "meets job requirements in a fully satisfactory manner."   The only negative comments on the written performance evaluation are a note regarding internet usage and some allegations regarding Plaintiff's interactions with his co-workers – both of which were addressed by Plaintiff in his response which was submitted to Mr. Eaker.  Mark Eaker testified that he never found Plaintiff to be argumentative and abrasive as indicated.  Further, none of the issues that are reflected in the performance review were ever "previously discussed" with Plaintiff.  Tammy Becker has indicated in an affidavit that she addressed these issues with Plaintiff as they occurred, but Mr. Brown denies

that any issue regarding interaction with co-workers was ever brought to his attention. Further, Ms. Becker's comment to Plaintiff regarding his internet usage was made shortly after he started his employment and was made in the context of needing to find more work to keep Plaintiff busy – consistent with a comment on the 2008 written performance evaluation regarding increasing Plaintiff's workload.

A reasonable jury could choose to disbelieve ScriptPro's proffered reason not only because of these inconsistencies but also because ScriptPro did not adhere to its own company practice regarding unsatisfactory evaluations. As previously discussed, Plaintiff was not given tasks or goals to complete within a certain time frame as a result of his "unsatisfactory" evaluation.  Plaintiff received no further feedback from any member of ScriptPro management regarding resolution of his "performance issues."  To the contrary, in late October 2008, Mark Eaker informed Plaintiff that he saw "nothing that concerned" him, that Plaintiff was "safe" and everything was "taken care of."  In fact, prior to being informed that he was being terminated for "previously discussed, unresolved performance issues" on November 21, 2008 – two days after informing his supervisors about his arrangement with Mark Eaker and requesting time off to help care for his wife and newborn – no one had discussed brought any performance issues to Plaintiff's attention.

Based on this evidence a reasonable jury could infer from the falsity of ScriptPro's explanation "that the employer is dissembling to cover up a discriminatory purpose."

The second piece of circumstantial evidence presented by Plaintiff, from which a reasonable jury could infer a discriminatory animus, consists of "evidence that he was

treated differently from other similarly-situated employees." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d at 1230.

Unlike female employees, when Plaintiff requested to work from home following the birth of his son, he was denied the opportunity and terminated two days later. Plaintiff has identified four female employees who were permitted to work from home following the birth of a child.  One in particular, Kimberly Cygan, was also a customer service operations analyst who reported to Tammy Becker.  Despite ScriptPro's willingness to accommodate female employees needs after the birth of a child, when Plaintiff requested a similar arrangement he was informed that any arrangement he had with his previous supervisor was "null and void" and was promptly terminated before he had an opportunity to make a formal request to the Vice President of Customer Service. ScriptPro argues that Mr. Brown did not properly request to work from home because he never made a request to Shane Coughlin.  However, based upon the reaction he received from Al Somers, Mr. Brown concluded it may be in his best interest to simply drop the issue.  Further, Plaintiff was terminated a mere two days after his meeting with Mr. Somers, before he ever had an opportunity to make a request to Shane Coughlin.

That there were some similarly situated females who were allowed to work from home following the birth of a child, when paired with the evidence regarding Plaintiff's performance evaluation gives rise to an inference of discriminatory intent.  As previously discussed, the reason set forth by ScriptPro for Plaintiff's termination is pretextual and not supported by the evidence.  As such, when viewed in the light most favorable to Plaintiff, there remains a genuine issue of material fact and summary judgment must be denied.

## IV.   <u>OVERTIME DUE PURSUANT TO FLSA</u>

The FLSA provides that employees shall be compensated for time worked in excess of forty hours per week at a rate of one and one-half times the regular rate at which he is employed.   29 U.S.C. § 207(a)(1).   An employee bringing an action for unpaid overtime compensation and liquidated damages has the burden of proving that he performed work for which she was not properly compensated. *Baker v. D.A.R.A. II, Inc.,* 2008 U.S. Dist. LEXIS 8741 (D. Ariz. 2008), citing *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946), superseded on other  grounds by statute as noted in, *Carter v. Panama Canal Co.,* 150 U.S. App. D.C. 198, 463 F.2d 1289 (D.C.Cir. 1972). To support such a claim, the Plaintiff must show that he actually worked overtime, that the amount of overtime was shown by justifiable and reasonable inference and the employer had actual or constructive knowledge of the overtime.   *McMillin v. Foodbrands Supply Chain Services, Inc.,* 272 F.Supp.2d. 1211 (D.Kan. 2003).

It is well settled in case law and regulations that "duties performed by an employee before and after scheduled hours, even if not requested, must be compensated if the employer "knows or has reason to believe" the employee is continuing to work, 29 C.F.R. § 785.11, and the duties are an "integral and indispensable part" of the employee's principal work activity.   *McLaughlin v. Somnograph, Inc.,* 2005 U.S. Dist. LEXIS 38562, *11 (D.Kan. 2005), citing *Steiner v. Mitchell*, 350 U.S. 247, 256, 76 S. Ct. 330, 100 L.Ed. 267 (1956); 29 C.F.R. §§ 785.24 and 785.25.  The regulations caution that "work not requested by suffered or permitted is work time." 29 C.F.R. § 785.11.  The reason an employee continues to work beyond

his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.  Id.  Mere promulgation of a rule against such work is not enough.  Management has the power to enforce the rule and must make every effort to do so.  29 C.F.R. § 785.13.  The issue of actual or constructive knowledge of overtime violations is ultimately a fact question.  *Reich v. Dept of Conservation and Natural Resources*, 28 F.3d 1076, 1082 (11th Cir. 1994).

Here, Plaintiff has presented evidence that he was working an additional approximately ten hours per month running performance reports from home in the evenings.  These reports concerned the performance of a robot and required that the report be run after business hours when the robot is not in operation.  Both Mark Eaker and Shane Coughlin acknowledged in depositions that they were aware that Plaintiff was running reports.  Shane Coughlin acknowledged that he knew Mr. Brown was running the reports from home and confirmed it was a legitimate project.  SOF 137.  Further, Plaintiff's wife observed on several occasions that Plaintiff would work from home in the evenings.  Mr. Brown has presented evidence that he had conversations with Mr. Eaker regarding running reports from home in order to have some flexibility with his schedule when his child was born.  Even assuming that the Mr. Brown never discussed running these reports from home with Mr. Eaker or Mr. Coughlin, the very nature of the project and the requirement that the report be run after business hours was sufficient to put ScriptPro on notice that Mr. Brown was doing additional work in the evenings.

Regardless of what Eaker knew regarding Plaintiff's overtime from home, it is undisputed that ScriptPro was put on notice of Plaintiff's overtime work at least by

November 19, 2008, when Plaintiff met with Tammy Becker and Al Somers.  In that meeting, Plaintiff informed Ms. Becker and Mr. Somers of his arrangement with Mr. Eaker and indicated that he has been working some "unpaid time" from home in the evenings.  This is further evidenced by the email correspondence following the meeting.  See, Defendants Exhibit 14.

Defendants cite to *Whitaker v. Pacific Enterprises Oil Co*, 1992 U.S.App. LEXIS 5135, an unpublished Tenth Circuit case, as "fatal to Brown's FLSA claim." *Whitaker* can be easily distinguished from the case at hand.  In *Whitaker*, the only evidence provided by the Plaintiff regarding his overtime were his own statements regarding the amount of time worked and conclusory statements that his supervisors had seen him on numerous occasions working late.  1992 U.S.App. LEXIS 5135 at *6.  While it is true that Plaintiff did not record his hours worked from home and thus cannot present any written documentation, his wife is able to corroborate that he was running reports from home in the evening.   Further, Plaintiff has presented evidence regarding his conversations with Mark Eaker and Al Somers, which would indicate that each were aware of the overtime.   Perhaps most important, Shane Coughlin acknowledged a conversation with Mark Eaker regarding Mr. Brown running reports from home.  This case is more akin to the situation in *McMillin*, 272 F.Supp.2d at 1217.  In *McMillin*, Plaintiff had performed overtime work from home in the evenings, had not kept records of the overtime work performed from home, but she had discussed the overtime with both her supervisor and the Director of Human Relations.  The Court found that the evidence submitted in that case was sufficient to create genuine issues of material fact and survive summary judgment.  Id.  Plaintiff's evidence is similar to that in *McMillan*.

That Mr. Eaker now disputes Plaintiff's testimony simply creates a genuine issue of material fact to be determined by the jury.  As such, summary judgment is inappropriate and must be denied.

## **CONCLUSION**

As discussed above, a reasonable jury, when faced with the evidence presented here, could return a verdict in favor of Mr. Brown on all four of his claims. Consequently, ScriptPro's motion for summary judgment must be denied in its entirety.

Respectfully Submitted:

SLOAN, EISENBARTH, GLASSMAN,
   MCENTIRE & JARBOE, L.L.C.
1000 Bank of America Tower
534 S. Kansas Ave.
Topeka, Kansas 66603
Telephone   (785) 357-6311
Fax         (785) 357-0152

  s/Danielle N. Davey
Alan V. Johnson, KS #9992
ajohnson@sloanlawfirm.com
Danielle N. Davey, KS #24205
ddavey@sloanlawfirm.com

## CERTIFICATE OF SERVICE

I herby certify that on the 11th day of April, 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following parties:

Jennifer M. Hannah
Lathrop & Gage, LLP
Building 82, Suite 1000
10851 Mastin Boulevard
Overland Park, KS 66210

Rosalee M. McNamara
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108

**I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: NONE**

 s/Danielle N. Davey
Alan V. Johnson, KS #9992
Danielle N. Davey, KS #24205
SLOAN, EISENBARTH, GLASSMAN,
    MCENTIRE & JARBOE, L.L.C.
1000 Bank of America Tower
534 S. Kansas Ave, Suite 1000
Topeka, Kansas 66603
Telephone    (785) 357-6311
Fax             (785) 357-0152
ajohnson@sloanlawfirm.com
ddavey@sloanlawfirm.com