## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **FRANK BROWN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 10-2296-JAR** |
| ) | |
| ) | |
| **SCRIPTPRO, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ————————————————————— ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Frank Brown brings this action against his former employer, defendant ScriptPro, LLC alleging violations of the Family Medical Leave Act ("FMLA"),[1] the Fair Labor Standards Act ("FLSA"),[2] and reverse gender discrimination in violation of Title VII of Civil Rights Act of 1964.[3] This case comes before the Court on Defendant's Motion for Summary Judgment (Doc. 38). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court grants defendant summary judgment on all claims.

### I.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[4] In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[1] 29 U.S.C. §§ 2601–2654.

[2] 29 U.S.C. §§ 201–219.

[3] 42 U.S.C. § 2000e-2(a).

[4] Fed. R. Civ. P. 56(a).

the light most favorable to the nonmoving party.[5]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[6]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[8]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[9]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[10]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[11]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[12]  Rather, the nonmoving party must

---

[5]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[7]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[8]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[9]*Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

[10]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[11]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[12]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

"set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13]

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.

## II.    Uncontroverted Facts

With the above rules of law and principles of application in mind, the following facts are uncontroverted, stipulated to, or viewed in the light most favorable to plaintiffs.

Defendant ScriptPro, LLC ("ScriptPro") is in the business of developing, manufacturing, marketing and selling automated prescription drug dispensing systems and related software. Defendant hired plaintiff Frank Brown in March 2007 as a Customer Service Operations Analyst.  Plaintiff's duties included monitoring customer service calls for quality assurance.

### June 2008 Performance Review

Defendant required immediate supervisors to complete written performance reviews of their subordinates by the end of June each year.  Tammy Becker directly supervised plaintiff from March 2007 to November 2007.  Thereafter, Mark Eaker supervised plaintiff, although

---

[13]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[14]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

plaintiff continued to directly report to Becker.  In June 2008, on behalf of Eaker, Becker

prepared plaintiff's evaluation for the time period from July 2007 to June 2008.  At that point,

Becker was the person with the most knowledge about plaintiff's job performance.  Eaker

presented the performance review to plaintiff in July 2008.  Plaintiff received a cumulative grade

of 2.8.  In the performance review, for "Quality of Work- Customer Service," plaintiff was rated

"MR" signifying "Meets job requirements in a fully satisfactory manner.  And, for "Attendance,"

plaintiff was rated "RE," signifying "Rarely equaled in exceeding job requirements."  But for

two of the four areas of work performance, i.e. work relationships, as well as planning and

organization, plaintiff was rated "MM" signifying "Marginal Performance which must be

improved.  Does not consistently meet job requirements."

     For  "Planning & Organization of Work," which is described as "Accuracy and

completeness of work in a timely manner," plaintiff was rated  "MM," signifying "Marginal

performance which must be improved."  Narrative comments in this section included, "[s]till in

the learning process of his job (retaining info).  When given an assignment he does perform solid

steady work but would like to see more initiative and motivation in his role.  He did take the

initiative in developing with Kristin a soft skills program for the help desk which was well

done."  And, in a section entitled "Able to complete varied projects in a timely manner," there

was the comment "[t]here is concern regarding excessive internet use during working hours.

Will continue to increase his work load over the next year to see how the additional workload is

handled."  Plaintiff provided a written response to this part of the performance review, noting

"[o]ver a year ago, I was given an 'informal review.'  My supervisor mentioned a concern about

how much time I was spending on the Internet.  She also commented that she understood and

sympathized that I had only worked at ScriptPro for 3 months and that I had very little work to do.  I reduced my Internet time in response to her feedback and Internet use has not been mentioned to me again since then."

For work relationships, plaintiff also was rated "MM" signifying Marginal Performance which must be improved.  Does not consistently meet job requirements."  There were narrative comments about this in the performance review: It was noted that "Frank needs to be more aware of his personal boundaries at work.  He has had loud disruptive personal phone conversations at his desk. . . . .  Example: Arguing loudly with his wife on the phone."  Plaintiff acknowledged that there were a couple of times when he had heated phone conversations with his wife, although in plaintiff's view he "never stepped outside the bounds of professionalism."  Eaker had on one occasion confronted plaintiff and directed him to take his personal calls outside or in a break room.  And, Becker received such complaints from other employees prior to June 2008.

The performance review also stated that plaintiff

> [h]as a tendency to be argumentative and abrasive with other co-workers. If another employee is having a conversation with a person he has the tendency to interrupt or jump in the middle of that conversation. He needs to be aware of how he comes across and to back down when other people act uncomfortable. . . . (Example: . . . Employees feeling uncomfortable at the way he stares at them as they walk by his cube. Interrupting conversation regarding sports and getting into arguments.).

Becker had received such complaints about plaintiff from other employees.  Eaker testified that he did not personally experience plaintiff being argumentative or abrasive, but Eaker acknowledged that did not have much contact with plaintiff.  Eaker had received complaints, however, from Dave Hoelting and another employee, that plaintiff jumped into the middle of employee conversations uninvited.

Becker discussed the performance review with plaintiff, but did not provide him with a corrective action plan, tasks or goals.  Eaker testified that he would typically require the employee to give periodic updates on items of concern, but that was his personal practice.

**Performance and Behavior Concerns after the Performance Review**

After the June 2008 review, Becker had continued concerns about plaintiff's work performance.  In September 2008 plaintiff failed to timely complete his work assignment on the Pentium III project, which required him to call about sixty sites.  In late September 2008, Becker asked plaintiff why he had failed to complete the project on time.  Plaintiff responded that he had difficulty getting some of the customers to participate.

At the end of October 2008, Eaker voluntarily resigned and left defendant's employ.  In his exit interview, Eaker told Coughlin that Becker had given plaintiff a less than desirable evaluation, which plaintiff had disputed.  After this meeting, Eaker sent plaintiff an email advising him that Eaker had told Coughlin that plaintiff disputed the evaluation and that Eaker thought plaintiff was "safe."

In October 2008, defendant implemented the Scorecard system.  The Scorecard system served as the basis for quality monitoring and for evaluating and providing important feedback to employees for customer calls.  On November 17 and 18, about two weeks after the system was fully operational, Becker advised plaintiff that he had some errors in his Scorecards and needed to re-do the work.

After the June 2008 performance review, Becker continued to have concerns about plaintiff's behavior, as well.  During an October 3 training session on the new Scorecard system, Becker observed  plaintiff looking around, yawning and rolling his eyes.  Then, immediately

6

following the meeting, plaintiff asked Becker the very types of questions that had just been

covered in the training.  Becker also perceived that plaintiff was disruptive in QA team meetings

and took extended lunches; but Becker did not discuss these concerns with plaintiff.

**FMLA Leave Policy**

When he was first hired, plaintiff received and signed a form acknowledging that he was

responsible for knowing the contents of  defendant's Employee Handbook.  Concerning FMLA

leave, this handbook stated:

> If an employee is eligible for FMLA benefits, they may use their accumulated
> PTO for a work absence due to conditions outlined by the Family Medical Leave
> Act.  This leave may be paid or unpaid depending on: (1) the remaining balance
> of the employee's PTO account; and (2) participation in short-term disability
> insurance and meeting the plan's qualifying conditions. For more information,
> contact the Human Resources Department directly.

Plaintiff was also aware of notices regarding the FMLA, posted in various locations,

including break rooms.  Neither the notices nor the employee handbook provided information

about the requirements, period of eligibility or the application process, other than directing the

employee to contact the HR department.  No one at ScriptPro verbally advised plaintiff of the

twelve-week leave eligibility or the application process.

**FMLA Leave**

Plaintiff never expressly requested "FMLA" leave.  But, in March 2008, seven months

before his baby was born, plaintiff advised Eaker that his wife was pregnant and that he would

need time off when the baby arrived in order to help care for his wife and children.  Eaker did

not advise plaintiff that he might be eligible for FMLA and did not direct plaintiff to consult with

HR.

Plaintiff testified at his deposition that, with Eaker's permission, from July 2008 through

7

October 2008, he worked about eighty hours from home, running reports for two pharmacy chains that had to be run after hours.  Plaintiff testified that he made this arrangement with Eaker so that he could bank time to take as leave, after the birth of his child, without having to charge the leave as PTO.  Eaker denied that he had given plaintiff permission to work from home, although Eaker knew plaintiff was running these reports.  Eaker could not recall authorizing plaintiff to work overtime.  Coughlin testified that he spoke with Eaker about plaintiff running reports from home.  Coughlin testified that he told Eaker that he would not approve overtime for plaintiff or any other employee from that group, so that if plaintiff was working on "legitimate projects" from home and spending "five hours downloading reports on Wednesday night then you're going to have to let him go early on Friday or something like that."

Employees are responsible for keeping their own time in defendant's KRONOS timekeeping system, and employees can access KRONOS from home if the employee is logged on to the system from a computer at home.  Plaintiff did not record the time he worked from home in the KRONOS system.  Defendant's employee handbook does not contain instructions for reporting overtime specifically, but does require that non-exempt employees such as plaintiff turn in time sheet for all hours worked.  Plaintiff did not record or document the hours he worked from home on time sheets or in any other manner.

In October plaintiff again requested leave in order to care for his wife and children, when his wife gave birth.  Eaker did not advise plaintiff that he might be eligible for FMLA and did not direct plaintiff to consult with HR.  Eaker granted plaintiff's leave request.  The baby was born on October 26, 2008.  From  October 27, 2008 through November 7, 2008, plaintiff was out of the office; the first week was paid time off ("PTO").  Defendant's policy allowed for PTO for

8

health, vacation and personal reasons; the employee had to request PTO from their supervisor at least two weeks in advance, but shorter notice was allowable at the discretion of the supervisor generally for situations involving sickness or other situations covered by the FMLA.  The second week plaintiff worked from home, as Eaker had authorized.  Eaker testified that only Coughlin could approve a request to work from home; but Eaker could not recall whether he told plaintiff that only Coughlin could approve this.  Defendant does not have a policy regarding employees working from home; the decision is left to the head of the employee's division.  The primary factors utilized by Coughlin in determining a person's eligibility to work from home were that the job must be able to be performed equally as well from home for at least 90 percent of the time, the employee must be performing his or her job well and have the ability to work without direct supervision, and the employee must have a significant need.

Certain female employees had been granted permission to work from home: Katie Wingard, Bobbie Laincz, Kimberly Cygan and Faith Brown.  Wingard and Brown were allowed to work from home after giving birth; Laincz was allowed to work from home part-time after giving birth; and Cygan was allowed to work from home for a short time after giving birth.  All of these employees requested and received Coughlin's approval to work from home.  Although Cygan had the same job title as plaintiff and also reported to Becker, she did not have the same job responsibilities as plaintiff.  Nor did Wingard, Laincz or Brown have the same job responsibilities as plaintiff.

Kelly Northern, a male employee, also requested and received permission from Coughlin to work from home for one day a week.  Plaintiff testified that he was unaware of any other males being discriminated against by defendant.  Plaintiff further testified that he did not believe

9

that defendant harbored any ill will or bad feeling against him because of his gender.

**Events Leading up to Termination on November 21, 2008**

On or about November 9, plaintiff returned to work.  Eaker had left defendant's employ at the end of October and thus was no longer plaintiff's supervisor.  On November 17 and 18 Becker advised plaintiff that he made errors in the Scorecard system and needed to re-do the work.  On November 17, 2008, Plaintiff had a conversation with Al Somers, the Director of Customer Field Services, inquiring about who his new supervisor would be.  Plaintiff further advised Somers of his arrangement with Mark Eaker and his need to occasionally take some time off to help care for his wife and newborn, including a few hours later that week.  On November 19, 2008, Plaintiff emailed Becker regarding his need to take off during his wife's doctor appointment, because he had still not received a response from Somers.

Sometime in the week preceding November 21, Becker told Coughlin that plaintiff had stopped reporting to work.  There is no other evidence that plaintiff was not reporting to work, other than Becker's statement.  In this same time frame, Becker told Coughlin about her concerns with plaintiff's work performance.  After meeting with Becker, Coughlin reviewed plaintiff's 2008 evaluation for the first time.

On November 19, 2008, plaintiff sent an email to Becker, requesting to leave by 2 p.m. on November 20, because his wife had a doctor's appointment.  Plaintiff told Becker that he was not sure who to report to since Eaker had left, but that plaintiff wanted to advise Becker of his arrangement with Eaker, whereby he had worked from home and banked time, so that for the first few weeks after the baby was born, he could work from a home a few hours a week, as well as take time off.  Becker forwarded plaintiff's email to Somers,  Later that morning, November

19, plaintiff met with Somers and Becker, again advising them of his prior arrangement with

Eaker, and that he wanted to work from home so that his wife could go to a doctor's

appointment.  Somers and Becker advised plaintiff that this alleged arrangement with Eaker to

bank time off the clock would not be allowed.  Somers advised plaintiff that every hour he

worked must be recorded; and he further advised him that any request for a work from home

arrangement must be made to Coughlin for his approval.  Plaintiff told Somers that if "the deal I

had with Mark does not matter anymore then I can take PTO for the time I miss.  If it's going to

be a problem I'll just ask her to reschedule."  In the course of this conversation, neither Becker

nor Somers advised plaintiff that he should apply for FMLA leave or speak to HR.  During the

November 19 meeting, Somers and Becker neither expressly denied nor granted plaintiff's

request to leave by 2 p.m. on November 20.  However, in response to plaintiff's inquiry about

working from home, Somers told plaintiff to go back to his desk and go to work, which plaintiff

understood to be a denial of the request. After this conversation on November 19, plaintiff did

not apply to Coughlin for permission to work from home on November 20; and plaintiff never

applied to Coughlin before plaintiff's termination on November 21.

      During the November 19 meeting, Somers raised his voice, and plaintiff responded by

raising his voice.  Plaintiff immediately apologized to Somers.  After the meeting, Somers sent

plaintiff an email confirming the conversation in their meeting; plaintiff responded immediately

and confirmed his understanding that all hours worked must be recorded.  Neither Somers nor

Becker raised any of the issues concerning plaintiff's work performance or behavior during this

November 19 meeting.

      Following the November 19 meeting, Somers told Coughlin about plaintiff's behavior in

the meeting.  Coughlin decided to terminate plaintiff, based on plaintiff's unresolved performance issues and his outburst during the meeting with Somers.  In making the decision to terminate plaintiff, Coughlin relied upon information received from Becker and Somers, particularly in the week before the termination.  This included Becker advising Coughlin the week before plaintiff's termination that plaintiff had stopped reporting to work, had a belligerent attitude, loud and unprofessional personal phone calls, errors in his score cards, and untimely performance on the Pentium III project, as well as other issues raised in plaintiff's July 2008 performance review.  Coughlin reviewed plaintiff's July 2008 evaluation, but no other documents, in making his decision to terminate.  Coughlin did not speak with plaintiff about any of these performance or behavior issues during the week before termination.  Coughlin did not speak with Eaker about plaintiff's performance issues, nor with any of those employees still employed at defendant.

Plaintiff was terminated on November 21, 2008.

## III.    Discussion

Defendant moves for summary judgment on plaintiff's claims for FMLA interference, FMLA retaliation, Title VII reverse gender discrimination, and unpaid overtime compensation under the FLSA. The Court addresses each in turn.

### A.    FMLA Claims

The FMLA entitles a qualified employee up to twelve weeks of leave during any twelve month period "[b]ecause of the birth of a son or daughter or the employee and in order to care for such son or daughter,"[16] or "[i]n order to care for the spouse, or a son, daughter, or parent, of the

---

[16]29 U.S.C. § 2612(a)(1)(A).

employee, if such spouse, son, daughter, or parent has a serious health condition."[17]  Plaintiff

asserts his FMLA claims under two theories: (1) interference under § 2615(a)(1) of the FMLA,

and (2) retaliation under § 2615(a)(2) of the FMLA.  The Court discusses each in turn.

### 1.      Interference

Under the interference theory, plaintiff has the burden to show entitlement to FMLA

leave, but need not show the employer's intent to interfere with FMLA leave.[18]  Under this

theory, if an employer interferes with an employee's FMLA-created right to a medical leave, it

has violated the FMLA, regardless of its intent.[19]  But, "[a] reason for dismissal that is unrelated

to a request for an FMLA leave will not support recovery under an interference theory."[20]

A prima facie case of interference thus requires a showing that: (1) plaintiff was entitled

to FMLA leave; (2) that an adverse action by the employer interfered with plaintiff's right to

take FMLA leave; and (3) that the employer's adverse action was related to the exercise or

attempted exercise of plaintiff's FMLA rights.[21]  A denial, interference or restraint of FMLA

rights is a violation irrespective of the employer's intent.[22]  So, the *McDonnell Douglas* burden

shifting analysis does not apply to FMLA interference claims.[23]  When an employee requests and

---

[17]*Id*. § 2612(a)(1)(C).

[18]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877-78 (10th Cir. 2004) (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 298, 961 (10th Cir. 2002).

[19]*Id.*

[20]*Id*. at 878.

[21]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (quoting *Jones v. Denver Pub. Sch*., 427 F.3d 1315, 1319 (10th Cir. 2005)).

[22]*Id.*

[23]*Id.*

can demonstrate an entitlement to FMLA leave, she has no greater rights than the employee who continues to report to work.[24] Thus, an employee may be terminated, even where the termination interferes with her ability to take FMLA leave, so long as she would have been terminated regardless of her leave request.[25]  It is the employer's burden to demonstrate that the employee would have been terminated irrespective of his request for, or taking of FMLA leave.[26]

> ### a.   Entitlement

Although there is no dispute that plaintiff was generally eligible for FMLA leave based on the tenure of his employment, defendant argues that he was not eligible for FMLA leave because he neither requested FMLA leave, nor gave defendant the requisite prior notice of his need for FMLA leave.  First, there is no requirement that the employee expressly ask for FMLA leave, nor even mention the FMLA.[27] If the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to tell the employee that he or she might qualify.[28]  To be sure, the uncontroverted facts show that plaintiff gave defendant sufficient notice such that defendant had reason to know that plaintiff might qualify for FMLA benefits.

Second, the Tenth Circuit has held that the notice requirement is separate from the substantive analysis of an FMLA interference claim—it is not an element of the FMLA

---

[24]*Id.*

[25]*Id.*

[26]*Id.*; *see Metzler*, 464 F.3d at 1180 (citation omitted); *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

[27]*Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir. 2001) (citations omitted).

[28]*Id.*

interference claim.[29]  Nonetheless, the Court finds that plaintiff gave defendant sufficient notice.

The statute generally requires at least thirty days notice of the intent to take leave to care for

one's newborn child.[30]  The uncontroverted facts demonstrate that in March, some seven months

before the birth of his child, plaintiff gave Eaker notice that he would need time off after the

birth of his child.  On November 17, plaintiff had a conversation with Somers and advised him of

his arrangement with Eaker, as well as of his need to take leave during his wife's doctor

appointment on November 20.  This constituted sufficient notice, as well, because the statute

places a duty on the employee to give thirty days prior notice to the employer of a "planned

medical treatment," for a serious health condition of the employee or the employee's spouse, or

"such notice as is practicable."[31]

      The Court finds that there is no genuine issue of material fact in this case that plaintiff

satisfied his obligation to give notice that was practicable.  Plaintiff was on leave from October

26 to November 7.  Plaintiff returned to the office on November 9 and by then, Eaker had left the

company.  In fact, one of the purposes of plaintiff's communication with Somers on November

17 was to find out to whom he was to report.  Moreover, neither the employee handbook, posted

flyers, nor his supervisors advised plaintiff that he was eligible for FMLA leave, nor how to

request such leave.  Three days prior notice was practicable under these circumstances.  Notably,

even though he was not duly advised of his rights and duties under the FMLA. the

uncontroverted facts show that plaintiff satisfied his duty under the FMLA to "make a reasonable

---

[29]*Bones*, 366 F.3d at 877 n.2.

[30]29 U.S.C. § 2612(e)(1).

[31]*Id.* § 2612(e)(2).

effort to schedule the treatment so as not to disrupt unduly the operations of the employer," with respect to requests for planned medical treatment.[32]  In his November 17 email, plaintiff offered that if working from home or taking PTO for his wife's doctor appointment, to care for his child, was a problem, he could have her try and reschedule.

Defendant argues that plaintiff has failed to meet the first element of his prima facie case of FMLA interference, that he was entitled to FMLA leave.  But, an otherwise eligible employee may take FMLA leave of up to a total of twelve workweeks during any twelve-month period to care for a newborn child.[33]  Plaintiff's initial request in March for leave at the time of his child's birth was clearly FMLA eligible.  Defendant challenges plaintiff's eligibility for FMLA leave on November 20, for his wife's doctor appointment.  But plaintiff has come forward with evidence that demonstrates he was eligible.  On November 20, his child was less than one month old, and under the FMLA, plaintiff was entitled to up to twelve weeks of leave.  Defendant correctly points out that the FMLA does not allow intermittent leave to care for a newborn child, absent the employer's agreement.[34]  But, plaintiff was entitled to take intermittent leave for purposes of caring for his wife, if she had a serious health condition.[35]  Under the FMLA, a "serious health condition" means an illness of physical condition that involves continuing treatment by a health care provider.[36]  The Court finds disingenuous defendant's argument that the doctor appointment did not relate to a serious health condition, for this doctor appointment was less than a month

_____

[32]*Id.* § 2612(e)(2)(A).

[33]*Id.* § 2612(a)(1)(A).

[34]*Id.* § 2612(b).

[35]*Id.* § 2612(a)(1)(C), (b).

[36]*Id.* § 2611(11)(B).

16

after the birth of the child, during the period of post partum recovery.  Plaintiff has come forward with evidence upon which a reasonable jury could find that he was entitled to FMLA leave.

<b>b.        Adverse Employment Action Interfered with FMLA Right</b>

The second element is that an adverse action, in this case termination, interfered with the employee's right to take FMLA leave.  As defendant posits, there is no genuine issue of material fact that it did not interfere with plaintiff's right to leave during the period of October 26 through November 7.  Indeed, it is uncontroverted that defendant granted plaintiff leave during this two week period after the birth of his child, although defendant failed to advise plaintiff of his FMLA rights.  For that reason, plaintiff's claim for FMLA interference fails with respect to that period.

But, with respect to plaintiff's request to work from home, or alternatively for leave on November 20 and beyond, the uncontroverted facts show that defendant did not grant plaintiff's request and thus interfered with plaintiff's right to leave.  Defendant argues that plaintiff asked to work from home, which is not a request for FMLA leave or leave at all.  However, the evidence, viewed in the light most favorable to plaintiff, is that plaintiff requested permission to work from home consistent with his understanding of his agreement with Eaker, and plaintiff alternatively requested PTO if he would not be granted permission to work from home that day.

Defendant further argues that Somers and Becker did not deny plaintiff's request, but told him any request to work from home must be made to Coughlin, and plaintiff failed to make the request to Coughlin.  Viewing the evidence in the light most favorable to plaintiff, Somers and Becker effectively denied plaintiff's request.  They referred him to Coughlin with respect to the request to work from home.  But they ignored his alternative request, for PTO.  And, this request came in the context of several communications spanning November 17 to November 19, when

17

plaintiff provided information by which they were on notice that plaintiff was requesting the type of leave that might fall within the ambit of the FMLA.  Plaintiff attempted to explain to them that he had an arrangement with Eaker to earn flex time to take leave after the birth of his baby, to care for his wife and baby.  Irrespective of whether he was to be unpaid or paid through a flex time arrangement or otherwise, defendant was on sufficient notice that plaintiff was entitled to leave under the FMLA.  Just as Eaker had failed to inform plaintiff, Somers and Becker failed to inform plaintiff that he had rights under the FMLA; and none of them directed plaintiff to contact HR.

Moreover, defendant's reliance on the employee handbook and posted flyers to inform plaintiff of his eligibility and rights is unjustified.  Neither the handbook nor the flyers provided information about FMLA eligibility and rights.[37]  The FMLA requires that the employer provide information "explaining the Act's provisions and providing information concerning the procedures for filing complaints of violations of the Act . . . ."[38]  Somers and Becker should have directed plaintiff to apply or determine his eligibility for FMLA leave, rather than sending him back to his desk, which was in effect a denial of leave.  While plaintiff did not follow up with a request to work from home to Coughlin, since he was terminated only two days later, a reasonable jury could find that defendant impaired plaintiff's rights under the FMLA when it did not grant his November 19 leave request.

---

[37]The "notice" provided by the employee handbook is clearly deficient. It reads, in its entirety:
> If an employee is eligible for FMLA benefits, they may use their accumulated PTO for a work absence due to conditions outlined by the Family Medical Leave Act. This leave may be paid or unpaid depending on: (1) the remaining balance of the employees PTO account; and (2) participation in short-term disability insurance and meeting the plan's qualifying conditions. For more information, contact the Human Resources Department directly.

[38]29 C.F.R. § 825.300

### c.      Causation

The third element of the prima facie case requires a showing that the adverse action,

termination, was related to the exercise or attempted exercise of the employee's FMLA rights.[39]

To survive summary judgment, the employer must point to uncontroverted evidence from which

a reasonable jury could find that the employee would be terminated regardless of the employee's

exercise or attempted exercise of rights under the FMLA.[40]   To be sure, the timing of the

termination "has significant probative force," in evaluating whether there is a causal relation

between the FMLA leave and termination.[41]   But defendant points to largely uncontroverted

evidence of performance and behavior problems that would have caused defendant to terminate

plaintiff irrespective of his request for leave.   Plaintiff's June 2008 performance evaluation was

problematic.   Although plaintiff received favorable ratings on his attendance and the quality of

his work in customer service, he received deficient ratings in the areas of planning and

organization of work, as well as in work relationships.   With regard to his performance in

planning and organizing work, plaintiff does not dispute that he received an informal review,

early in his tenure, that expressed concerns about his Internet usage; but plaintiff contends that

he used the Internet only because he did not have a sufficient workload at that point in his tenure.

But, even discrediting the evidence about his usage of the Internet, there remains

uncontroverted evidence that he continued to have performance problems after the June 2008

---

[39]*Metzler*, 464 F.3d at 1180.

[40]*See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1160-61 (10th Cir. 2009).

[41]*Id.* at 1160 (finding temporal proximity suggestive where termination occurred one day after employee
told employer she would need to take off six weeks for illness).

review.[42]  Plaintiff does not dispute that in October 2008 he failed to timely complete his work

on the Pentium project.  Nor does plaintiff dispute that in November 2008 he had to re-do work

on the Scorecard system because of his errors.  Although plaintiff offers explanations, that he

had problems with customer compliance on the Pentium project and that the Scorecard system

was new, this does not controvert the fact that his work was untimely and inaccurate.

Not only is there uncontroverted evidence of performance problems that continued even

after the June 2008 review, there is uncontroverted evidence of behavior issues before and after

the June 2008 review.  The June 2008 review documented complaints from co-workers about

plaintiff's behavior in the workplace.  Plaintiff acknowledges that he had loud personal phone

calls with his wife, which prompted Eaker to counsel with him prior to the June 2008 review.

And, in the June 2008 performance review, defendant documented complaints from employees

that plaintiff was argumentative and abrasive.  Plaintiff disputes this, relying upon Eaker's

statement that he had not found plaintiff to be argumentative or abrasive.  But, Eaker's statement

does not controvert the statements of other employees, particularly because Eaker acknowledged

that he had little personal contact with plaintiff.   Moreover, even Eaker had received complaints

from employees about plaintiff's behavior, specifically that plaintiff interrupted conversations of

other employees.

Furthermore, on October 3, Becker perceived that plaintiff was rolling his eyes and being

---

[42]*Cf. id.* at 1160-61 (finding a genuine issue of fact concerning whether employer would have fired
employee when: there was a "good deal of evidence" that she was a highly valued employee doing excellent work;
she received only complimentary feedback; there was no documentation of performance problems, despite the
employer's common practice of such documentation; co-worker complaints were inconsistent; her supervisor
admitted that her misreporting of work time could have stemmed from a misunderstanding and ordinarily would not
be the basis for termination; and comments from subordinates were either unfounded or inconsistent with one
another.)

inattentive during the training session on the new Scorecard system and, after the training session, plaintiff asked Becker questions about subject matter that had just been covered in the training session.  This is also uncontroverted evidence of the employer's perception of a behavior issue, significant when one considers the uncontroverted evidence that plaintiff then had a performance issue with the Scorecard system.  Finally, it is uncontroverted that during his meeting with Somers and Becker on November 19, plaintiff raised his voice to Somers, a manager, behavior consistent with defendant's perception that plaintiff was argumentative and abrasive in the workplace.  In short, plaintiff's claim for FMLA interference fails because defendant has offered uncontroverted evidence, upon which a reasonable jury would find that defendant would have terminated plaintiff irrespective of his leave or request for leave.

## 2.     Retaliation

Plaintiff also claims that defendant retaliated against him for his attempted exercise of FMLA rights when it terminated him on November 21, 2008, two to four days after his November 17 conversation with Somers, subsequent emails to Becker and November 19 meeting with Somers and Becker.  In these various conversations and emails, plaintiff tried to ascertain whom to report to, since Eaker had resigned, and attempted to explain his prior arrangement with Eaker and his continued need to work from home or take leave to care for his wife and child.

FMLA retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas*.[43]  Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.[44]  In order to establish a prima facie case of FMLA retaliation, plaintiff must

---

[43]*Metzler*, 464 F.3d at 1170 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

[44]*Id.*

demonstrate that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between the two actions.[45]  With respect to the first element of the prima facie case, defendant argues that plaintiff did not avail himself of a protected right under the FMLA because defendant did not expressly request FMLA leave, nor give defendant notice.  But, as the Court discussed in its analysis of the FMLA interference claim, the uncontroverted facts show that plaintiff did sufficiently avail himself of his rights under the FMLA, giving the employer sufficient notice of his circumstances and needs to inform the employer that plaintiff had a right to FMLA leave. With respect to the second element of the prima facie case, there is no dispute that plaintiff was adversely affected; defendant terminated plaintiff.

Plaintiff must also show that there was a causal connection between the two actions.  As discussed above, defendant has shown that it would have terminated plaintiff irrespective of plaintiff's exercise or attempted exercise of FMLA rights. But while the employer's intent is not an element of FMLA interference claims,[46] the "critical inquiry" at the prima facie stage of a FMLA retaliation claim is "'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'"[47] The Tenth Circuit has long-recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to "'justify an inference of

---

[45]*Id.* at 1171.

[46]*Id.* at 1180.

[47]*Id*. at 1171 (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

retaliatory motive.'"[48]  In fact, a plaintiff may rely on temporal proximity alone only if "'the termination is *very closely* connected in time to the protected activity.'"[49]  But, "'unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation.'"[50]  The temporal proximity in this case is two to four days, sufficiently close to justify an inference of retaliatory motive.[51]  Thus, plaintiff has come forward with sufficient evidence to establish a prima facie case of FMLA retaliation.

The burden thus shifts to defendant to offer a legitimate, non-retaliatory reason for terminating plaintiff.[52]  As discussed above in the section on the FMLA interference claim, defendant has shown legitimate, non-retaliatory reasons for terminating plaintiff.  Defendant contends that it terminated plaintiff for performance and behavior issues.  To defeat summary judgment, plaintiff thus must show that there is a genuine dispute of material fact as to whether defendant's reasons are pretextual.[53]  Temporal proximity is a factor, but is not dispositive of the issue of pretext.[54]  A plaintiff typically makes a showing of pretext in one of three ways: (1)

---

[48]*Id.* (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

[49]*Id.* (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

[50]*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

[51]Defendant argues that plaintiff's claim fails based on plaintiff's deposition testimony that he relies solely on the temporal proximity to show a causal connection.  Defendant misrepresents plaintiff's testimony; plaintiff testified that the temporal proximity was "the big one," meaning the main reason.  For this reason, the Court finds without merit defendant's corollary argument that plaintiff's affidavit creates a sham fact issue.  *See Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169–70 (10th Cir. 2009).

[52]*Metzler*, 464 F.3d at 1171.

[53]*Id.*

[54]*Id.* at 1172.

evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[55]   A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[56]  While this burden is not onerous . . . it is also not empty or perfunctory."[57]

The Court will not reiterate its analysis in the above section on the interference claim. Although plaintiff challenges the credibility of defendant's assessment of his performance and behavior issues, much of the evidence underlying defendant's assessment is uncontroverted. Plaintiff has failed to point to weaknesses, implausibilities or contradictions in defendant's proffered reasons for terminating him.  Although there is uncontroverted evidence that in the last sixty days of employment plaintiff failed to timely complete a project and had to re-do work on another assignment because of the errors, it is also notable that two days before he was terminated, plaintiff admittedly raised his voice during a meeting with Somers, a manager.  That act alone might suffice for some employers to terminate an employee.

Plaintiff also argues that Becker violated company policy by not giving him a corrective

---

[55]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[56]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[57]*Id*. at 1323-24.

action plan after the June 2008 review.  But, there is no evidence that was company policy, the evidence was merely that Eaker followed that practice.  Moreover, corrective action plan or not, there was evidence that before the June 2008 review plaintiff was counseled about his Internet use and loud phone calls; during the June 2008 review plaintiff was counseled about his untimely and inaccurate work performance and other behavioral issues.  And after June 2008, the plaintiff continued to produce untimely and inaccurate work, as well as continued to behave in unacceptable ways, such as being inattentive during the training session and raising his voice to a manager.

It is evident that plaintiff's perception of the gravity and import of his performance and behavior issues differs from defendant's perception, and from the perception of Coughlin, the decision-maker.  Yet it is the decision-maker's perception of the problem that matters, not plaintiff's.[58]  Plaintiff asserts that Coughlin was tainted by Becker, who plaintiff maintains had a discriminatory motive, perhaps as evidenced by Becker telling Coughlin, sometime the week of November 21, that plaintiff had stopped reporting to work, which plaintiff controverts.

The "subordinate bias" or "cat's paw theory" of liability requires that the plaintiff establish more than mere influence or input into the decision, but requires that the biased subordinate's discriminatory reports, recommendations or other actions caused the termination.[59]  The employer can avoid liability by conducting an independent investigation of the

---

[58]*Kendrick,* 220 F.3d at 1231; *Berry v. T-Mobile USA, Inc.,* 490 F.3d 1211, 1220 (10th Cir. 2007) (requiring the court to examine the facts as they appear to the person making the decision, to determine whether the employer honestly believed those reasons and acted in good faith upon those beliefs.").

[59]*Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1060 (10th Cir. 2009).

allegations,[60] as Coughlin did here.  It is uncontroverted that Coughlin performed an independent

investigation, reviewing the June 2008 performance review, relying upon his own personal

knowledge, particularly with respect to employee complaints that had been made directly to

Coughlin, and speaking to both Becker and Somers, who advised him of plaintiff's ongoing

performance issues, as well as the fact that plaintiff raised his voice to Somers during the

November 19 meeting.

Pretext can also be shown by proving that similarly situated non-protected individuals

were treated more favorably for committing comparable conduct.[61]  "'Similarly situated

employees are those who deal with the same supervisor and are subject to the same standards

governing performance evaluation and discipline.'"[62]  Although plaintiff contends that similarly

situated employees were allowed to work from home after the birth of a child, he fails to show

that these individuals were in fact similarly situated.  Katie Wingard, Bobbie Laincz and Faith

Brown had different job titles and responsibilities; and although Kimberly Cygan had the same

job title and reported to Becker, she had different job responsibilities.  Moreover, these

individuals' requests to work from home were granted for varying periods of time, reflecting

defendant's overarching policy that work from home arrangements were decided case by case,

depending on a number of factors.  Moreover, plaintiff was in fact allowed to work from home

for one of the two weeks after the birth of his child.

In short, plaintiff fails to point to facts upon which a reasonable jury could find

---

[60]*Id.*

[61]*Kendrick*, 220 F.3d at 1232.

[62]*Rivera v. City & County of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

defendant's articulated reason for terminating plaintiff was pretextual.  For this reason, plaintiff's claim for FMLA retaliation fails.

### B.    Title VII Claim

Plaintiff claims that defendant discriminated against him on the basis of his gender, by not allowing him to work from home after the birth of his child, while allowing similarly situated female employees to work from home after the birth of a child.  Title VII makes it an unlawful practice for an employer "to deprive any individual of employment opportunities . . . because of such individual's . . . sex."[63]  Title VII's prohibition on discrimination protects members of both historically disfavored groups and historically favored ones.[64]  Claims such as plaintiff's, brought by a member of a majority group, have been characterized as claims for "reverse discrimination."[65]

There are two general methods by which a plaintiff can prove a claim of reverse discrimination.[66]  The plaintiff can employ the burden shifting analysis of *McDonnell Douglas*; or the plaintiff can produce either "'direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability that but for the plaintiff's status, the challenged employment decision would have favored the plaintiff.'"[67]  Plaintiff's claim for reverse gender discrimination fails under either analysis.

As discussed in the above sections on the FMLA claims, even if plaintiff establishes a

---

[63]42 U.S.C. § 2000e-2(a)(2).

[64]*See Livingston v. Roadway Exp., Inc.,* 802 F.2d 1250, 1252 (10th Cir.1986).

[65]*See Notari v. Denver Water Dept.,* 971 F.2d 585, 588 (10th Cir.1992).

[66]*McGarry v. Bd. of Cnty. Comm'rs of Cnty. of Pitkin,* 175 F.3d 1193, 1199 (10th Cir.1999).

[67]*Id.* (quoting *Notari,* 971 F.2d at 590).

27

prima facie case of reverse gender discrimination, defendant has articulated a legitimate non-discriminatory reason for terminating plaintiff and plaintiff has not met his burden of showing pretext.

Moreover, plaintiff fails to produce direct or indirect evidence that supports a reasonable probability that, but for plaintiff being a man, he would not have been terminated.  Indeed, plaintiff points to evidence establishing the contrary.  For example, a male employee, Kelly Northern, requested and was granted permission from Coughlin to work from home one day a week.  Plaintiff testified that he was unaware of any other males being discriminated against by defendant; and plaintiff testified that he did not believe defendant harbored any ill will or bad feeling against him because of his gender.  For these reasons, plaintiff's Title VII claim of reverse gender discrimination fails.

C.      FLSA Claim

Plaintiff claims that pursuant to his arrangement with Eaker, he worked approximately eighty overtime hours from July to August 2008, running reports from home, for which he was uncompensated, in violation of the FLSA.  It is undisputed in this case that defendant is an employer; and it is undisputed that plaintiff is an employee within the meaning of the FLSA, and not an exempt employee under § 213 of the FLSA.[68]

The FLSA provides that employees shall be compensated for time over forty hours per week at a rate of one and one-half times the regular rate at which he is employed.[69]  To sustain an FLSA claim for unpaid overtime compensation, the plaintiff has the burden of proving that he

---

[68]29 U.S.C. § 213.

[69]*Id.* § 207(a)(1).

performed work for which he was not properly compensated.[70]  Specifically, the plaintiff must show that he actually worked overtime, that the amount of overtime was shown by justifiable and reasonable inference, that the employer had actual or constructive knowledge of the overtime, and that the employer failed to pay plaintiff for the overtime.[71]

There is uncontroverted evidence in the record that plaintiff actually worked overtime. Plaintiff testified that he worked about eighty overtime hours from July to August 2008.  This testimony is corroborated by his wife's vague recollection that he worked from home.  It is also corroborated by Coughlin's testimony that Eaker had a conversation with him about plaintiff running reports from home; Coughlin advised Eaker that he could not pay plaintiff overtime, but could allow plaintiff to take off early on a workday.  This same testimony from Coughlin provides evidence that defendant knew that plaintiff was working overtime hours from home, even if they were to be treated as flex hours.[72]

Nonetheless, plaintiff fails to show the amount of overtime by justifiable or reasonable inference, the second element of an FLSA claim.  Plaintiff admittedly did not input his overtime hours in defendant's KRONOS system; nor did he keep records of any sort to document the overtime hours worked.   Plaintiff relies solely upon his memory, which apparently is no more specific than that he worked about eighty hours during the stated two-month period.  He produces no documentation or evidentiary detail that would allow an inference as to the amount

---

[70]*McMillin v. Foodbrands Supply Chain Servs., Inc.*, 272 F. Supp. 2d. 1211, 1217 (D. Kan. 2003).

[71]*Id.*

[72]*See* 29 C.F.R. § 785.11 (providing duties performed by an employee before and after scheduled hours, even if not requested, must be compensated if the employer "knows or has reason to believe" the employee is continuing to work).

of overtime he worked, and admits that he neither created such documentation in the KRONOS system, nor created such documentation in some other manner.[73] Thus, the Court grants defendant summary judgment on this claim.

## IV.    Conclusion

Plaintiff's claim for FMLA interference fails because he cannot show evidence of a causal connection between his exercise or attempted exercise of FMLA rights and his termination; defendant proved that it would have terminated him anyway.  The Title VII and FMLA retaliation claims fail because defendant proffered legitimate non-discriminatory and non-retaliatory reasons for terminating plaintiff, and the evidence when viewed in a light favorable to plaintiff fails to establish that defendant's stated reasons were pretextual.  Plaintiff's claim for Title VII reverse discrimination also fails for lack of evidence that defendant engaged in discrimination against males. Finally, plaintiff's FLSA claim fails because he has not and cannot show the amount of overtime by justifiable and reasonable inference.  Therefore, the Court grants defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 38) is **GRANTED.**

**IT IS SO ORDERED.**

Dated: September 1, 2011

　　　　　　　　　　　　　　 S/ Julie A. Robinson　　　　　　　　　
　　　　　　　　　　　　　　JULIE A. ROBINSON
　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[73]*Cf. McMillin*, 272 F. Supp. 2d at 1215 (finding although the employee had not kept track of her overtime hours nor reported the time, the employer's own computer records conclusively proved that the plaintiff had not been compensated for 19 hours and 25 minutes of time that she worked from home, and further plaintiff presented evidence that she had inquired with her immediate supervisor on more than one occasion about being paid for her home-based overtime).

31